IN THE UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF INDIANA

FILED
APR 22 2013
U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

|  |  |
|---|---|
| DALE RUSSELL, | ) |
| Petitioner, | ) CRIM. CASE NO: |
|  | ) 1:08-cr-00004-SEB-KPF |
| v. | ) |
|  | ) CIVIL CASE NO: |
| UNITED STATES OF AMERICA, | ) 1:13-cv-0538-SEB-DKL |
| Respondent. | ) |

## AMENDMENT TO 28 U.S.C. § 2255 PETITION

COMES NOW the Petitioner, Dale Russell, and, under F.C.R.P. Rule 15(a)(1)(A), submits his attached affidavit as an amendment to his previously-filed Title 28 U.S.C. § 2255 petition.

RECEIVED
APR 22 2013
U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

AFFIDAVIT

I, Dale Russell, being of sound mind and body, and to the best of my ability and recollection, make this affidavit based upon my personal knowledge of the events described herein.

On March 3, 2010, I was convicted by a jury of four counts of violation of Title 18 U.S.C. § 2251, sexual exploitation of a minor. The following document covers information related to or germane to those charges and conviction.

Personal Background.

At eight years old, and at my request, my parents purchased a camera for me for my birthday. From that point on, I took pictures of everything -- people, trees, barns, plants, friends, and just about anything else that I found interesting or thought may be fascinating in a print medium. As I grew older, my artistic tastes matured and congealed in style and were mainly in abstract photography and studies of the human form. I was also drawn to the elegant grace and powerful athleticism of the aesthetic sports and arts -- gymnastics, diving, ballet, and ice skating -- which became favorite subjects of my photography. Additionally, I have spent the last 23 years as a gymnastics instructor and coach, teaching and choreographing powerful and graceful routines that define the art.

I am experienced in both silver-substrate film-based and digital photography as well as video and sound production

and editing. I began taking artistic portraits and sports photos at age 12 and was a photographer for my high-school newspaper and yearbook. I took both art and journalism photography courses at Ball State University, Indiana University, and Herron School of Art in Indianapolis and have earned credits toward a BFA in Photography.

I also have a Bachelor of Science degree from Indiana University in Sports Science, specializing in biomechanics, as well as an unclaimed minor in Computer Science. Additionally, I have credits toward a BS in Electrical Engineering from Purdue University.

Photography in High School and College.

My photojournalistic and artistic photography continued through high school, college, and post-college. Besides being in my high school publications, my first professionally published photo was for a telephone book cover in Muncie, Indiana. I also began photographing nude portraits and started studying and using advanced darkroom techniques to produce highly distinctive and artistic prints. Several of my prints, including some nudes, have won awards in art shows and exhibitions in Indianapolis, Greenfield, Bloomington, Louisville, Cincinnati, L.A., and Miami.

To finance my photography, I sought paying jobs photographing sports, weddings, and artistic portraits, as well as commercial and advertising work. Besides abstract photographic art, the main subject for my art has been the human body. Aside fro purposeful and planned photography subjects, I also took many quotidian snapshots.

Photographic Technology Primer.

In film-based photography, the capture of an image on the film substrate is adjustable only within a finite range of film speeds, exposure times, aperture openings, and focus settings, as well as variations in the chemical process of the development solution, time, temperature, and physical acceleration of the process. The final print made from this film image is likewise limited in its ability to be altered, generally confined to adjustments in density, contrast, and size. More complex modifications in the final image require advanced darkroom skills and are constrained by the limitations of the physical print medium. Essentially, the final image is usually the same as or very close to the image as originally taken.

Digital photography, in contrast, is highly flexible in both image acquisition and the final printed result. An almost unlimited array of special effects can be performed to create images that range from antique to futuristic, surreal to realistic. An image can be composed that may combine several images, taken at different times and disparate locations, that is indistinguishable from reality. As a simple example, an image could be created that shows President Obama shaking hands with President Kennedy and, temporal impossibility notwithstanding, could look very real and convincing.

Composite Photos.

Many of my photographic prints have been composites of multiple images. For example, the print entitled "Locked Out of Paradise" is a composite of three different images taken at three different times and locations. (This print was scanned into the court record at the end of trial.) The image of the wall, gates, and street were taken about 2003 at a cemetery in Indianapolis; the image of the flora in the background was taken in Kentucky in 2000; and the image of Jane Doe 2 in front of the gates was taken at a nude beach in 2000. The images were scanned from film and all three were combined in Adobe PhotoShop and then adjusted, filtered, and reworked to create the final, award-winning print. Each of the individual images alone would not have been noteworthy: a cemetery entrance, a random field, and Jane Doe 2 looking through a fence on the beach. However, the character and context of the final print may be completely different and unrelated to the original images. Accordingly, when an image is taken, it is impossible to foresee its possible future uses.

KidModels Agency and the Websites.

In the late 90s, I provided children's fashion photography for the website of a local children's clothing retailer. Having trouble locating available child models for the assignment, I started a local modeling agency for children called KidModels Agency. Several local parents signed up their children for representation by the agency, including several whose children participated in pageants. In 1999, a website was created for the agency and the models. All models were given a "model name" to protect their identity and any

potential clients could only make contact through the agency. For an extra fee, individual webpages were created for individual models who wanted them. Then, after a suggestion from a pageant parent, I added the option for sponsors on the sites. This was on offshoot of the manner in which pageant kids would pay for the pageant outfits and travel expenses, where most sought "sponsors" door-to-door -- both businesses and individuals -- who would donate money to the child and would receive a complimentary brochure or mini-portfolio of photos in appreciation of sponsorship. On the model's portfolio website, a person wishing to sponsor a model could pay through the website and receive complimentary access to view the model's portfolios. The funds from the websites were used by parents to pay for modeling lessons, clothes, travel expenses to modeling auditions, or whatever the parent deemed appropriate. Two such websites were created for my daughters, Jane Doe 1 and Jane Doe 2. (In the interests of privacy, the designations Jane Doe 1 and Jane Doe 2 will be used in this document to refer to my oldest and youngest daughters, respectively.) Their websites were online for approximately one year before being ordered closed in October of 2004 by a family court in Indianapolis.

<u>Photo Shoots.</u>

The monthly photo sessions for the web sites provided the models with the opportunity to gain actual experience and practice in modeling. The models were instructed in proper form, poise, and posture, as well as eye contact and various facial expressions. the photo shoots were fun and exciting for the models and, besides studio shoots, were at various

locations and events, such as parks, festivals, carnivals, amusement parks, and tourist attractions. Aside from a few shoots portraying a more serious mood, the photos show happy, smiling children, from preschool to late teens, in poses typical of what can be seen in a Sears of Limited Too catalog or in advertisements or catalogs for any number of other child, tween, and teen clothing retailers. As usual, any identifying items, such as nametags, house numbers, and street signs, are removed from the photos before they are published online or in prints to protect the identity and location of the models.

Naturism.

From an early age, I have been perplexed as well as intrigued by our cultural aversion to the sight of the human body and the societal compulsion to keep one's body covered when not necessary. Thus, I have been a lifelong naturist (nudist) and, after high school, began visiting naturist beaches and resort. Accordingly, many of my photos -- artistic, snapshots, or otherwise -- are of nude subjects.

In our household, unless we had non-naturist guests, it was not uncommon for someone to be nude if the weather was hot, after taking a shower, while relaxing, for comfort, or for no particular reason. Thus is the nature of naturism -- clothing is optional. Nudity is not restricted unless appropriate to do so. The sight of someone's body is not remarkable and is perceived as nothing but normal, and definitely not a sexual thing. Naturists have rules regarding appropriate behavior that, in many cases, are of a higher standard than the clothed populace. The psychological,

social, and cultural benefits of naturism include higher self-esteem, better body health, less focus on outward appearance and having the "right clothes," more inner focus, and, for children growing up in a naturist setting, decreased sexual precocity, delayed sexual initiation, and less "body curiosity." By taking away the "mystery" of they body, the "titillation" of hidden areas is removed. Those unaccustomed to nudity invariably see an element of sexuality where there is none. The same holds true whether in person of by someone viewing nude photos.

Photos in the Case.

The photos at issue in this case are from photo shoots which were taken, like many others, for the general purpose of depicting the nudist lifestyle. Aside from a general directive, the photos were unposed and unplanned. There was a parallel video also made. The photo in Count 2 is a single image from a photo series of over 200 images. In this image, Jane Doe 1 is apparently preparing to do a handstand (incorrectly, I might add). Looking at it, there are two things to consider. First, the depiction is an interim "in-between" shot that would generally be considered an unusable waste image that results from shooting a continuous sequence of images of a fast action. Second, there is nothing sexual or lascivious about the image. The activity was gymnastics, not anything suggestive, erotic, or sexual. The intent was to photograph Jane Doe 1 doing gymnastics in the context of nudism, not to engage her in anything lascivious. The same holds true for the photo in Count 4. Jane Doe 2 was doing general dance or ballet stretches and exercises. The

depiction is of a typical barre exercise and is not sexual in any way. In Count 3, the photo is of Jane Doe 2 drying off after a shower. The photo is of simple nudity. Again, there is nothing in the photo to even remotely suggest a sexual character. Whether it was posed or spontaneous is absolutely irrelevant. In Count 1, Jane Doe 1 is acting out a scene in which she is getting out of bed to start a presumably typical day. Whether she normally sleeps nude is irrelevant; whether the scene was created or was spontaneous is irrelevant; whether it was photographed in the early morning or in the late afternoon is irrelevant. None of that matters. The general plan for the photo series was to portray a nudist's morning routine, which is EXACTLY what it portrays. Other than a general direction regarding what the photo shoot was about, there was little, if any, instruction or intentional posing during the shoot. Jane Doe 1, having extensive experience in posing, acted out the scene with poise and self-confidence. The scene starts with her in the bed, feigning sleep. She then wakes up, yawns and stretches, then gets out of bed, taking her blanket. She then wraps herself with the blanket and playfully twirled and spun the blanket around and wrapped herself in the blanket, all without prompting. She then tossed the blanket on the bed and looked for clothes in the closet, got dressed, grabbed her backpack, and headed out the door. This portrayal of a "typical day" was unscripted, unrehearsed, and, aside from general directions, unprompted. There was nothing sexual or suggestive, neither implied nor explicit, in the actions, conduct, character, or context of the portrayal, and none was intended. Other than the fact

that the subject is nude, which is not noteworthy in the context of nudism, nothing in the photo series was unusual. If the subject were clothed, there would be nothing remarkable about the photo series or the subject's actions. There was not indication of nor intention to have the subject engage in any lascivious conduct -- either implied or explicit. Further, none of the nude photos of Jane Doe 1 or Jane Doe 2 were ever posed to any website or put online in any way at any time, despite any testimony otherwise.

While the photos in these depictions may not have had an immediate use or purpose, they could have ben used in books and publications about nudist family life or combined with other images to create a composite, such as the photo "Locked Out of Paradise." Such publications and photos are widely available and, lacking a sexual connotation, perfectly legal in the U.S. There was no intent to engage the subjects of the photos in any type of sexually explicit conduct and no such conduct was depicted. Before taking any nude photos, I researched state and federal laws, including case law, to determine exactly what the law was to make sure that everything I did was completely lawful. And it was. Every photo I took was well within the lawful boundaries and was not even near the "gray area." No was was broken. Further, individually and collectively, these images are depicting a social and political issue and are a cultural study of nudism. This is protected speech under the First Amendment.
Disposition of the Photos and the Search.

These photos, like thousands of others, were transferred to CD, sight unseen, and placed in a storage box -

- a virtual "to-do" list of future photographic projects. Sometime between September of 2004 and June of 2005, the box went missing and was assumed to be lost or misplaced in the maze of other still-unpacked boxes in my garage. On June 29, 2005, I was presented with a search warrant based on the completely legal gymnastics video as probable cause. The video was found in another case in Michigan. Apparently, Douglas DuBois had stolen my box of photos and image CDs during a visit to my home or when he helped our family move. The search agents took multiple computers and cameras, numerous CDs and DVDs, memory cards, and several items that were not authorized by the search warrant, such as audio headphones and a personal diary. Nothing chargeable was produced from the search. Even so, the government introduced one of the computers into evidence and said that a hard drive was missing and implying that there were possibly illegal images contained on it. In reality, the opening on the front of the computer was for a backup hard-drive cartridge, and the "hole" was because the door had broken off. The backup-drive cartridge had been removed and cannibalized for use in another computer.

Mexico and the Move.

As early as 1980, I began researching alternate places to live. The primary criterion was good weather (no winter). Also important were low cost of living, close and easy travel to/from the U.S., congenial culture, easy language, and equivalent and modern infrastructure. Several locations in Mexico were at the top of the list. When my wife and I were dating in the early 2000s, we discussed at length our plans

for moving to Mexico.

In late August, weary of the pointless and vexatious harassment of the investigation and tired of waiting to move, we notified our family of our plans and moved to Puerto Vallarta, Jalisco, Mexico, confident that I had done nothing illegal and that there would be no indictment, ever. However, the prosecutor, determined to indict me, in spite of a lack of unlawful conduct and a fruitless investigation, persevered in her goal and obtained an indictment in January, 2008, four months after the move to Mexico.

In Mexico, we had a local phone number that was listed in the phone book and directory assistance as well as an Indianapolis phone number that rang at our home and on our cellphones. All of my websites and blogs listed an e-mail address that went straight to my computer and smartphone. An information check on my website domain names would reveal a Mexico mailing address. A 1-800 number listed on the websites also rang our phones. There was no intent to flee from prosecution because I did not break any laws. There was no attempt to elude authorities nor to hide my whereabouts. All of our friends and family knew where we were and how to contact us. Additionally, we made several trips back to Indianapolis during the time we lived in Puerto Vallarta. The prosecutor's claim that I was fleeing justice is nothing more that a baleful and malicious attempt to mischaracterize reality to imply guilt to the jury. If I were fleeing anything, it would have been the injustice of a government whose prosecutors flout the Constitution and distort and misrepresent facts in order to win their cases and score a

conviction over 98% of the time. These are the same prosecutors who lied to the jury when they said I was fleeing.

In late August of 2009, at the behest of the U.S. government, I was deported from Mexico and arrested upon re-entry into the U.S. -- over five years after the initial investigation began. Interestingly, there was no record of me entering Mexico nor any records of border crossings or visas, while my wife and stepdaughter had complete immigration records. It was suggested that the U.S. government may have "paid off" someone in the Mexican immigration department (Instituto Nacional Migración) to destroy my files, however I have no proof. Upon my return, I was charged with four counts of Title 18 U.S.C. § 2251(a) and (d), charges which I fought at trial in March of 2010. At that trial, the prosecutor's case was based almost entirely on lies and mischaracterized evidence extrinsic to the charged photos -- the fleeing to Mexico; the implications based on my computer; the derogatory portrayal of our nudist lifestyle; the disparaging remarks about me; the false portrayal of the websites and the false implication that the nude photos were published on the sites; the irrelevant fact that the photos were found in Canada; the mischaracterization of the modeling and photo sessions; the unproven and dubious "touching incident" eight years earlier; the misrepresentation of the other, uncharged photos; and the complete fabrication of the hypothesis of my intent by the prosecutor.

My Attorney and Expert Witnesses.

In late 2009, I asked my public defender, James

McKinley, to obtain expert witnesses for digital photography, computers, and nudism. In late February, 210, I reiterated the need for experts. Unfortunately, Mr. McKinley got only one: Jawn Bauer, an expert on nudism and general counsel for the American Association for Nude Recreation (AANR) as well as other national and regional naturist associations.

Mr. Bauer was not allowed to testify, however he was expected to comment on and elaborate on the nature of nudism, its cultural and social implications, its philosophy and ethical standards, and its family values. Specifically, he was expected to state the following: that naturism (or nudism) is a lifestyle that advocates a code of dress that allows nudity when appropriate, that the philosophies of naturism espouse wholesome family values and shuns any connection between nudity and sexuality, that naturism promotes a healthy respect for one's body and teaches modesty in behavior and attitude, that naturism is a perfectly lawful lifestyle in the U.S. and around the world. However, to the clothed and unacquainted remainder of our society, social nudism is a misunderstood and suspect cultural practice. This misconception and lack of understanding was prejudicial to me in the trial. Mr. Bauer's testimony would have provided background and a basis on which to place my lifestyle and photographs in a broader context and would have offered a better understanding of my lifestyle.

A digital photography expert would have testified that, according to the EXIF data from the image files, the files had been modified from the original image created by me. He would have testified that the images were cropped or

"zoomed in," focusing more on Jane Doe 1 and 2. He would have testified that, as a matter of photographic practice, the wider a view, the less likely the focal point is any particular object of person, and that the converse it true; that if an image is zoomed in on a certain area or object, such that is the prominent thing in the image, then that is most likely the intended focal point. ("Focal point" is one of the Dost factors.)

If my attorney had obtained a computer expert, the expert would have testified that, by looking at the configuration in the Windows Registry file, it would have been obvious that the so-called "missing hard drive" was configured as a backup drive. And, he would have testified that the backup drive had, at one time several years prior, contained a duplicate of the data stored on the internal hard drive and would have been able to give the last date the hard drive was backed up. Further, he would have testified that the "missing hard drive" was found in another computer recovered in the search of my residence. This testimony would have made it very clear that the prosecution's entry of the computer into evidence was nothing more than a thinly-veiled tactic to confuse and mislead the jury.

Facts of the Case.

A fact is truth, something that is correct -- not an opinion or a hypothesis, but actual truth. Almost everything the prosecutor stated or implied as "proof" or "evidence" was NOT a fact and NOT true. It was all part of an attempt to play to the jury's emotions and the hysteria surrounding exploitation crimes and to sway their opinion by painting a

picture of me as a "bad person" and more likely to have had a nefarious intent in taking the photos.  The only problem is that it's false -- all a fabrication by the prosecutor.  Here are the facts: the photos in counts 1 through 4 are NOT a "lascivious exhibition" of the genitals; they are NOT pornographic; they were never intended to be pornographic.  These are the true facts.

Conclusion.

The prosecution's case was non-existent.  They found the perfectly-legal nude gymnastics video and apparently thought that they would search my house and hit a jackpot of child pornography.  When that didn't happen, they resorted to deception and mischaracterization of innocent evidence.  The prosecution's case was nothing more than a campaign to discredit the truth and disparage my character.

Absolutely nothing in any of the photos or their context indicate an intent to portray sexual conduct.  I did not use the photos in any pornographic way, post them to any website, trade them with anyone, or even show them to anyone at all.  I did not create photos of a sexual nature or intend for them to "elicit a sexual response" in any way.  Only the inferences and conjectures of the prosecutor paint the pictures as such.  The photos are nothing but simple nudity, which is completely legal.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my ability and recollection and is executed on this 16th day of April, 2013.

Respectfully submitted,

*Dale Russell*

Dale Russell, #56938-112

USP Tucson

PO Box 24550

Tucson, AZ 85734

DECLARATION OF MAILING

On this 16th day of April, 2013, I, Dale Russell, invoke the "mailbox rule" (Houston v. Lack, 487 US 266 (1988)), declaring that on this date I personally hand-delivered the accompanying enclosed Affidavit as an Amendment to my previously-filed Title 18 U.S.C. § 2255 petition to the correctional staff at the United States Penitentiary yin Tucson, Arizona, with proper first-class postage affixed, and mailed it to the Clerk of the United States District court in Indianapolis, Indiana.

I, Dale Russell, hereby state that this is true and correct under the penalties of perjury.

Respectfully submitted,

Dale Russell

Dale Russell
#56938-112
USP Tucson
PO Box 24550
Tucson, AZ  85734